Filed 8/22/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TOREN ERIC NIEBER,<br><br>    Defendant and Appellant. | D079208<br><br><br>(Super. Ct. No. SCD267738) |

APPEAL from an order of the Superior Court of San Diego County, Laura W. Halgren, Judge. Affirmed.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Robin Urbanski, Acting Assistant Attorney General, A. Natasha Cortina, Lynne G. McGinnis, and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

Toren Eric Nieber was convicted in 2017 for his role in the commission of a 2016 burglary and robbery during which one of the victims was shot and killed. At the preliminary hearing, the magistrate found insufficient evidence to hold over Nieber on a special circumstance allegation, and the matter proceeded to trial without that charge. Following a conviction on all

counts, Nieber appealed, challenging his sentencing pursuant to Penal Code[1] section 1172.6.[2] He argued that he should be resentenced without an evidentiary hearing pursuant to subdivision (d)(2) because the court's decision at the preliminary hearing constituted a "prior finding by a court" that he was not a major participant in the underlying crime. The trial court, which had presided over the preliminary hearing as well as the trial, ordered an evidentiary hearing and followed the procedures outlined in subdivision (d)(3). It concluded the People proved beyond a reasonable doubt that Nieber was a major participant who acted with a reckless indifference to human life and was therefore ineligible for resentencing. It denied the petition.

On appeal, Nieber makes three arguments. First, he contends the court improperly held an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3) because the court's finding at the preliminary hearing required it to resentence him under subdivision (d)(2). Second, he contends collateral estoppel likewise meant the court was required to follow the procedure detailed in subdivision (d)(2). Third, Nieber contends the court's conclusion that he was a major participant and acted with reckless indifference to human life is not supported by sufficient evidence. We find his contentions without merit, and we affirm.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

[2] Nieber brought his motion under former section 1170.95, which was renumbered as section 1172.6 without substantive change on June 30, 2022. (See Stats. 2022, ch. 58 (Assem. Bill No. 200), § 10, eff. June 30, 2022.) As such, we refer to the subject statute by its current number throughout this opinion whenever possible, unless we are discussing substantive legislative changes to former section 1170.95 before it was renumbered as 1172.6.

2

# I

## BACKGROUND AND PROCEDURAL FACTS

Nieber and co-defendant Lawrence Johnson were charged with murder,[3] with the special circumstance that it occurred in the commission of a burglary and a robbery. After the preliminary hearing, the court found there was insufficient evidence that Nieber was a major participant, and it dismissed the allegation. The People filed a third amended information that removed the special circumstance and the felon in possession of a firearm charges. The case proceeded to trial, and the jury convicted Nieber on all counts.

### A. The Crimes

We take the facts of the underlying conviction from our previous opinion, *People v. Nieber* (Jan. 21, 2020, D073059 [nonpub. opn.]):

"At approximately 11:45 a.m. on May 11, 2016, S.P. went to the grocery store and then returned to the house on Tommy Drive (the Tommy Drive residence) where he had been staying with his brother, J.P, and three other individuals, B.A., B.W., and W.S. No one else was home at the Tommy Drive [r]esidence at the time.

"S.P. shut the front door, set his groceries down on the counter, and went to the back room of the house to check his cell phone. As he was doing so, several men suddenly came into the house through the front door. S.P. believed there were three to five men in the group. One of them held a gun to S.P.'s head and told him to get down on the ground. The gun was a Beretta-style automatic pistol, similar to a Colt .45, and the man who held it to his head was about six feet tall, clean shaven with tan skin and age lines on his face. S.P. did not get a good look at any of the other intruders.

---

[3]    A third defendant, Scott Elliot Grizzle, was tried separately.

"As S.P. lay on the ground on his stomach with his hands behind his back, he heard the men rummaging through the house. The men asked him where B.A. was and what time he usually came home for the day, and then asked, 'Where's the money? Where's the weed?' S.P. told them that he had no idea and that he was just staying there for a while. He was aware that there were some marijuana plants growing in the back yard and believed they belonged to B.A., but he did not know for sure and did not tell the intruders about them.

"After a while, two of the men tied S.P.'s hands behind his back with an electrical cord and blue painter's tape and moved him to the front room of the house. They then covered his eyes with a piece of cloth, obstructing his sight. The men continued ransacking the house. They asked S.P. about some beer that was in the fridge and he thought he heard at least one bottle being opened and set down. He also heard them smoking something and believed it was methamphetamine because he did not smell cigarette smoke or marijuana. S.P. thought he heard the names 'Larry' and 'Joe' but could not recall the context in which the names were spoken.

"Approximately 15 to 20 minutes after the intruders moved S.P. to the front room, B.W. arrived at the residence. As soon as B.W. entered the house, one of the intruders put a silver handgun in his face and told him to get down. He got down on the ground and someone hit him in the back of the head with the gun. The intruders bound his hands behind his back and put a blindfold over his eyes so he could not see.

"S.P. heard the intruders ask B.W. what his name was and then many of the same questions they had asked S.P. about B.A. and the location of the marijuana and money. They also asked B.W. if he was B.A.'s partner, and then went through his pockets and took his cell phone, his driver's license, a

credit card, and a bank debit card. One of the men asked B.W. for the PIN number to the debit card. He told them the PIN and then heard one of the intruders leave and heard a car start outside.

"Later, B.W. heard one of the intruders say, 'Larry said the PIN didn't work,' and believed the speaker was relaying this information from a person calling on the phone to another one of the intruders in the house. The intruders told B.W. the PIN he had given them did not work and threatened to chop off his fingers if he did not tell them the correct PIN. He then heard someone come back through the front door, and shortly thereafter, someone put a gun to the back of B.W.'s head and said, 'What's the password? You gave me the wrong one.' B.W. said that he had given them the correct PIN and perhaps they were trying to take out too much money. He later learned that they were using a credit card instead of his bank card at the ATM, which is why the PIN he gave them did not work.

"Somewhere between five and 20 minutes after the second discussion about the PIN number started, and about 30 to 40 minutes after B.W. had arrived at the Tommy Drive residence, B.A. returned to the residence and entered through the front door. S.P. heard a scuffle and then heard the intruders say, 'Oh, hey, [B]. We've been waiting for ya. Tell us where the stuff's at. Tell us where the weed's at. Tell us where the money's at.' There were at least two voices talking to B.A. B.A. told them that everything he had was in a box and out in the backyard. They asked him if there was anything in his car and then S.P. heard movement towards the front door followed by a second scuffle.

"About 20 seconds later, S.P. and B.W. heard four to six gunshots, footsteps running out of the house, and then silence. S.P. waited for about 30 seconds and then called out to B.W. to see if he was okay. S.P. managed to

5

remove the restraints around his wrists and went to help free B.W. He did not see B.A. anywhere in the house so he went outside and found him lying facedown in the dirt next to the driveway in a pool of blood. S.P. attempted to assist B.A. while B.W. tried to find a neighbor to call the police.

"Meanwhile, a neighbor had heard the gunshots and walked outside to investigate. He heard someone say, 'Help me,' and saw S.P. rolling B.A. onto his back in the driveway. He could see that B.A. was seriously injured and called 911. The call was received at 2:48 p.m. and the police arrived a few minutes later at 2:51 p.m.

"B.A. was pronounced dead at the scene.

*"Investigation and Forensic Evidence*

"The police interviewed B.W. and S.P. [at] the scene that same day. B.W. said that he heard the name 'Larry,' but also said S.P. had told him that he heard the name 'Larry.'

"Several crime scene specialists collected evidence from the Tommy Drive residence that evening. Photographs were taken of the blue tape around B.W.'s wrist and the injury to the back of his head from where he was hit with the gun. The house appeared to have been ransacked, drawers had been opened and emptied, and items were left in disarray all over the floor. Officers collected a lighter and a pipe used to smoke methamphetamine from a couch in the front room, a half empty beer bottle from the floor, and another open beer bottle from the kitchen counter. They also collected and inventoried a pillowcase full of items that was left in the hallway. Inside the pillowcase, they found a plastic baggy of marijuana, cellphones, and ID's and credit cards belonging to B.W. and B.A.

"The police conducted DNA testing on a number of items retrieved from the house and found DNA belonging to Nieber on the mouth of the beer bottle

6

retrieved from the living room floor, DNA belonging to Johnson on a roll of blue painter's tape, and DNA belonging to Nieber, Johnson, and Grizzle—another separately convicted accomplice—on the mouth area of the methamphetamine pipe.[4]

"Officers on the scene found four shell casings behind the front door and in the living room of the Tommy Street residence, and three bullets were retrieved from in and around B.A.'s body. A criminologist later determined the three bullets were all fired from the same gun and the four shell casings were all fired from the same gun but, because the casings and bullets interact with different parts of the gun, she could not determine whether the bullets and casings were from a single gun.

"The police also obtained records for B.W.'s stolen credit cards, which indicated on the day of the murder someone had tried to use his Bank of America and Discover cards at a U.S. Bank near the Tommy Drive residence at around 2:00 p.m., and that another attempt was made to withdraw cash using the Bank of America card at a nearby 7-Eleven at 2:27 p.m. Surveillance footage from the U.S. Bank showed a man driving B.W.'s vehicle through the drive-thru ATM at approximately 2:00 p.m. and, at trial, two different detectives identified the driver as Nieber. Video footage from 7-Eleven showed a white male using the ATM around 2:27 p.m., but the man's face was not visible.

"An autopsy revealed that B.A. had sustained three gunshot wounds, including one that pierced his lung and aorta. Based on the autopsy report, the medical examiner opined the cause of death was gunshot wounds to the thorax and the manner of death was homicide.

---

4    DNA belonging to Grizzle was also found on several other items, including the other beer bottle, a black glove, and a mask.

"The police arrested Johnson in San Diego on May 16, 2016, following a high-speed car chase during which Johnson exceeded the speed limit and ran at least one red light. Johnson was driving a silver Chevrolet Monte Carlo that had been listed on a registration form filled out by Grizzle at a hotel in La Mesa on May 10. The police searched the car and found documents belonging to R.S. in the front passenger seat. Nieber was arrested three days later, on May 19, after a separate car chase in which Nieber ran a red light and crashed into another vehicle.

"Grizzle was arrested in Nevada several weeks later, on June 16, 2016. He had a key to a car that had been rented in San Diego, R.S. was with him, and when officers approached him, he asked if they were from San Diego. He also had a cell phone in his possession, and the police obtained records indicating the cell phone had been in the vicinity of the Tommy Drive residence between at least 1:07 p.m. and 2:35 p.m. on May 11.

"*Defense Case*

"S.P. told the officer on the scene that he was confident he could identify the individual that held a gun to his head but testified at trial that he did not recognize either Nieber or Johnson.[5] Further, because he was blindfolded for much of the time, he did not know who was in the house at any given time and could not be sure whether or when one or more of the intruders left, and also could not be sure of the time. S.P. denied having any knowledge of B.A. or B.W. being involved in the sale of drugs, but also stated that it was important to him to protect the memory of B.A. and that he would not like B.A.'s name to be tarnished.

---

5    S.P. also testified that he did not recognize Grizzle at that trial.

"B.W. testified that he had witnessed B.A. sell small bags of marijuana to people visiting the house, that it sometimes made him uncomfortable, and that there was at least one 'hard guy' who had come to the house that he did not like. He admitted owning an AR-15 shotgun but denied ever growing marijuana or having valuable amounts of marijuana in his possession and further denied being a partner of B.A. with respect to any marijuana growing or sales B.A. was involved in. However, a former girlfriend of B.W. testified that B.W. had grown and sold drugs while living at a prior residence and also at the Tommy Drive residence, and that he had become violent with her on several occasions during their relationship. She did not believe B.W. was a truthful person. A police officer also testified that there had been an investigation into the occupants of the Tommy Drive residence regarding possible drug sales.

"A neighbor testified that she saw a man matching Johnson's description—approximately six feet four inches, thin, with brown hair and wearing dark clothing—leaving the Tommy Drive residence in a green SUV at approximately 2:15 p.m. There were other people in the vehicle and there was no testimony indicating the green SUV, or the persons therein returned to the residence. Johnson's defense counsel argued the neighbor's description matched the video surveillance from 7-Eleven, indicating it was Johnson who was trying to use B.W.'s card at 7-Eleven around 2:30 p.m., and that there was no evidence that he returned to the Tommy Drive residence thereafter.

"Finally, the neighbor who called the police testified that he went outside shortly after hearing the gunshots and did not see anyone leave. He did see S.P. walk over to and stop in front of a white SUV for a couple of seconds, but he could not see what he was doing. S.P. admitted taking keys

9

to the SUV out of B.A.'s hand after he was shot but denied unlocking or opening the vehicle."

## B.  The Sentencing

The jury convicted Nieber of all charges, and the court found true all of Nieber's prior convictions in a bench trial.

Following appeal, we modified the judgment to strike prison priors in light of amendments to section 667.5, but we otherwise affirmed the judgment.  (*People v. Nieber*, *supra*, D073059.)

The court sentenced Nieber to 50 years to life for murder (§§ 187, subd. (a), 189); 18 years for robbery of an inhabited dwelling, to run consecutively (§§ 211, 212.5, subd. (a), 213); four years for robbery of an inhabited dwelling, to run consecutively; and one year four months for evading a police officer and reckless driving (Veh. Code, § 2800.2, subd. (a)), It stayed the sentence for first degree residential burglary (§ 654).  It also imposed a five-year enhancement for prior convictions (§ 667, subd. (a)(1)).

## C.  Section 1172.6 Proceedings

In June 2020, Nieber petitioned for resentencing under section 1172.6, alleging he was not the actual killer, did not intend to kill, and was not a major participant in the killing.  The People responded that no court or jury found he was not a major participant but conceded an evidentiary hearing should be held, and the court ordered an evidentiary hearing.

At the November 2020 hearing, the court explained it did not think its findings at the preliminary exam were the type of findings that automatically result in vacating the convictions under section 1172.6, subdivision (d)(2), particularly because there was a later trial.  It explained evidence presented at trial more clearly detailed Nieber's role in the crime than the evidence had at the preliminary hearing.  The court identified B.W.'s testimony, bank

10

surveillance photos, and a timeline established by ATM machines, as placing Nieber more closely to being a major participant than the evaluation based on the evidence available the preliminary exam.

The court applied the factors outlined in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) to Nieber's involvement in the crime and concluded the prosecution met its burden of proving Nieber was a major participant who acted with a reckless indifference to human life. Thus, he was not eligible for resentencing under section 1172.6, and the court denied his petition.

Nieber timely appealed.

II

DISCUSSION

A. Penal Code Section 1172.6

On September 30, 2018, the Governor signed Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437). "The legislation, which became effective on January 1, 2019, addresses certain aspects of California law regarding felony murder and the natural and probable consequences doctrine by amending Penal Code sections 188 and 189, as well as by adding Penal Code section [1172.6], which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in law would affect their previously sustained convictions." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722 (*Martinez*).)

By amending sections 188 (defining malice) and 189 (defining the degrees of murder), Senate Bill 1437 changed "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the

11

underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see *Martinez, supra,* 31 Cal.App.5th at p. 723.)

Senate Bill 1437 also added former section 1170.95. That section provides that "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts." (Former § 1170.95, subd. (a).) A petition may be filed when the following three conditions are met: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (Former § 1170.95, subd. (a)(1)-(3); see *Martinez, supra,* 31 Cal.App.5th at p. 723.)

If a petitioner files a facially sufficient petition, the trial court appoints counsel and determines whether the petitioner has made a prima facie case for relief under section 1172.6, former subdivision (c). (*People v. Lewis* (2021) 11 Cal.5th 952, 961-962 (*Lewis*).) In making this decision, the court "should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id.* at p. 974.)

"If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (§ 1172.6, subd. (c).) The court then holds a hearing within 60 days to determine

12

whether to vacate the murder conviction. (§ 1172.6, subd. (d)(1).) At this stage of the proceeding, the prosecution has the burden of proving "beyond a reasonable doubt[ ] that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); *Martinez, supra*, 31 Cal.App.5th at pp. 723-724.)

Alternatively, "[t]he parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have the murder, attempted murder, or manslaughter conviction vacated and to be resentenced." (§ 1172.6, subd. (d)(2).) Additionally, "[i]f there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." (*Ibid.*)

## B. Prior Court Finding

Nieber maintains he demonstrated eligibility under section 1172.6, subdivision (d)(2) and is entitled to immediate resentencing because the court made a finding at the preliminary hearing that there was insufficient evidence that he was a major participant. To reach this conclusion, the words "prior finding by a court" must include findings made at the preliminary hearing by a magistrate. Thus, we consider what type of "prior finding by a court" section 1172.6, subdivision (d)(2) contemplates.

The interpretation of a statute is a question of law, subject to de novo review. (*Lewis, supra*, 11 Cal.5th at p. 961.) Our primary task is to "determine and effectuate legislative intent" by looking to the statute's language. (*Woods v. Young* (1991) 53 Cal.3d 315, 323.) " ' " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning.' " ' " (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

13

" '[W]e look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]" [Citation.] That is, we construe the words in question " 'in context, keeping in mind the nature and obvious purpose of the statute . . . .' [Citation.]" [Citation.]' " (*People v. Arroyo* (2016) 62 Cal.4th 589, 595.) Further, " 'when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope.' [Citation.]" (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 343; see *People v. Garcia* (2016) 62 Cal.4th 1116, 1124 [explaining the purpose of the *noscitur a sociis* canon of construction].)

"According to the author, S[enate] B[ill] 1437 seeks to restore proportional responsibility in the application of California's murder statute, reserving the harshest punishments for those who intentionally planned or actually committed the killing." (Sen. Comm. on Public Safety, Rep. on Senate Bill 1437 (2017-2018 Reg. Sess.) Feb. 16, 2018, p. 3.) It was enacted "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with a reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The Legislature included "subdivision (d) to 'streamline the process of reducing prison crowding. [Citation.]' " (*People v. Harrison* (2021) 73 Cal.App.5th 429, 440 (*Harrison*).) To that end, subdivision (d)(2) provides sentencing relief when there is a "prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony . . . ." (§ 1172.6, subd. (d)(2).)

Several recent opinions have addressed the procedures outlined in section 1172.6, subdivision (d)(2). In *People v. Ramirez* (2019) 41 Cal.App.5th 923 (*Ramirez*), the court considered whether subdivision (d)(2) imposed a mandatory duty to vacate a sentence when there was a prior appellate court finding that the defendant was not a major participant or did not act with reckless indifference. (*Ramirez*, at p. 932.) There, on a habeas corpus petition, the Court of Appeal found there was insufficient evidence to support the jury's finding that the defendant was a major participant who acted with reckless indifference to human life. (*Id*. at pp. 926-927, 930.) The parties did not dispute the significance of the appellate court's finding; the issue was simply whether, given the finding, the trial court was required to vacate the conviction and resentence the defendant. (*Id*. at p. 933.) However, in holding that the language of subdivision (d)(2) imposed a mandatory duty to resentence the defendant under those circumstances, the court implicitly concluded that a finding of fact on a habeas appeal constitutes a "prior court finding." (See *Ramirez*, at p. 932.)

In *People v. Clayton* (2021) 66 Cal.App.5th 145 (*Clayton*), the jury made a not-true finding on a felony-murder special circumstance. (*Id*. at p. 149.) The court asked whether "the jury's unanimous rejection of the special-circumstance allegation establishes the petitioner's entitlement to relief under section [1172.6] as a matter of law." (*Id*. at p. 149.) It concluded the acquittal constituted "a prior finding by a jury that appellant 'did not act with reckless indifference to human life or was not a major participant in the felony' " even though it was not a factual finding of innocence. (*Id*. at pp. 154-155, 157.)

In *Harrison*, the court entered an acquittal on attempted murder and found the special circumstance not true during a bench trial, at the end of the

15

case in chief.  (*Harrison*, *supra*, 73 Cal.App.5th at pp. 435-436.)  It also found the defendant guilty of felony murder because he aided, abetted, and facilitated the commission of the robbery during which a victim was killed.  (*Ibid*.)  The defendant argued the acquittal was a prior bench finding that he did not act with a reckless indifference to human life or was not a major participant in the felony.  (*Id*. at p. 432.)

The court concluded that the not-true finding was the type of prior finding contemplated by section 1172.6, subdivision (d)(2):  "[T]he Legislature simply intended to prevent the prosecution in a resentencing hearing from trying to re-prove a theory that a fact finder had already rejected, which is consistent with the Legislature's purpose of using section [1172.6], subdivision (d) to 'streamline' the process of reducing prison crowding.  [Citation.]"  (*Harrison*, *supra*, 73 Cal.App.5th at p. 440.)  Thus, "[b]ecause juries seldom, if ever, determine actual innocence, it is more natural to interpret [section 1172.6], subdivision (d)(2)'s reference to 'prior finding[s] by a court or jury' as applying to the acquittals that juries commonly render."  (*Ibid*.)

Finally, in *People v. Hampton* (2022) 74 Cal.App.5th 1092 (*Hampton*), a jury found a defendant guilty of first degree murder and two counts of robbery but was unable to reach a verdict on a robbery-murder special circumstance allegation.  (*Id*. at pp. 1096, 1097.)  The People ultimately moved to dismiss the special circumstance charge for insufficient evidence, and the court granted the request.  (*Id*. at p. 1097.)  When tasked with determining if this was "a prior finding by a court or jury," the appellate court explained that it had not found any authority where a trial court cited "insufficient evidence" as the reason for dismissal at the end of trial and the dismissal was not found to be the equivalent of an acquittal.  (*Id*. at p. 1105.)

16

It explained "insufficient evidence" in that context is a term of art; when a jury is unable to reach a verdict, and the trial court concludes the evidence is insufficient as a matter of law to sustain the conviction, that ruling bars a retrial. (*Id.* at p. 1104.) Accordingly, it treated the court's dismissal following trial as equivalent to an acquittal. (*Id.* at pp. 1105-1106.)

Collectively, these cases suggest a defendant is eligible for resentencing under section 1172.6, subdivision (d)(2) if the defendant is acquitted of special circumstance allegations. The acquittal can be the result of an appellate court's factual findings in response to a habeas corpus petition (see *Ramirez*, *supra*, 41 Cal.App.5th at p. 933), a court or jury's not-true finding of a special circumstances allegation (*Clayton*, *supra*, 66 Cal.App.5th at pp. 154-155 [jury]; *Harrison*, *supra*, 73 Cal.App.5th at p. 441 [court]), or the dismissal of a special allegation after the evidence is submitted to the jury when there is not sufficient evidence to support the charge (*Hampton*, *supra*, 74 Cal.App.5th at pp. 1097, 1105). Thus, the type of "prior finding by a court" must, like a " 'prior finding by a . . . jury' " be the type of finding that challenges whether the People have demonstrated guilt beyond a reasonable doubt. Accordingly, we ask if the magistrate's finding at the preliminary hearing in this case was comparable to an acquittal that juries commonly render. (See *Harrison*, at p. 440.)

The role of a magistrate at a preliminary hearing is to assess whether there is sufficient evidence to move a case forward. (See § 872, subd. (a).) Unlike a jury, a magistrate overseeing a preliminary hearing "is not a trier of fact. He does not decide whether defendant committed the crime, but only whether there is 'some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' [Citation.]" (*People v. McGlothen* (1987) 190 Cal.App.3d 1005, 1011 (*McGlothen*).)

17

"[A] magistrate's order dismissing a felony complaint is not a bar to another prosecution for the same offense, either by filing a subsequent complaint [citations], or by seeking a grand jury indictment [citations]. Even a dismissal in the superior court following an order setting aside an information or indictment is no bar to a future prosecution for the same offense. [Citation.]" (*People v. Uhlemann* (1973) 9 Cal.3d 662, 666 (*Uhlemann*).) The question is one of probable cause, and " 'the probable cause test is not identical with the test which controls a jury . . . .' " (*Id.* at p. 667.) When the court accepts the prosecution's evidence at a preliminary hearing but determines there is insufficient evidentiary support, that is a legal conclusion. (*People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 496-497 (*Valenzuela*).) However, "[t]he magistrate lacks authority to determine the guilt or innocence of the defendant." (*People v. Wallace* (2004) 33 Cal.4th 738, 749 (*Wallace*).)

We agree with the trial court's assessment of its role at the preliminary hearing: its findings at the preliminary exam were not the type of findings that automatically result in vacating the convictions under section 1172.6, subdivision (d)(2). At the preliminary hearing, the magistrate found there was sufficient evidence to lead to a finding that Nieber acted with reckless indifference to human life but did not hold Nieber over on the special circumstances charge because it also found there was no evidence to show if he was aware of the violence or whether he planned for the violence. The court did not resolve evidentiary disputes or assess witness credibility in reaching this conclusion. (*Valenzuela, supra*, 73 Cal.App.5th at pp. 496-497.) And its determination that there was insufficient evidence to proceed to trial on the special circumstances allegation was based on the information before it at the time.

18

These findings did not constitute a determination regarding the truth of the special circumstance allegation, i.e., whether Nieber had in fact assisted his co-defendants while engaged in the commission and attempted commission of robbery. (See *Uhlemann, supra*, 9 Cal.3d at p. 667; see also *McGlothen, supra*, 190 Cal.App.3d at p. 1011.) Just like the court's finding that there was probable cause that Nieber acted with a reckless indifference to human life is not sufficient to establish guilt beyond a reasonable doubt, its finding that there was a lack of probable cause that Nieber was a major participant is not sufficient to acquit Nieber of those charges. The preliminary hearing " 'is not a trial, and if the magistrate forms a personal opinion regarding the guilt or innocence of the accused, that opinion is of no legal significance whatever in view of the limited nature of the proceedings.' [Citations.]" (*Wallace, supra*, 33 Cal.4th at p. 749, quoting *Uhlemann*, at p. 667.) The court's finding here simply meant there was not sufficient evidence at the time to proceed on those charges. (See *Uhlemann*, at p. 666; *Wallace*, at p. 749 ["A deficiency of proof at a preliminary hearing frequently reflects a temporary state of affairs. The prosecution may discover and proffer additional proof by the time . . . the case proceeds to trial"].)

The trial presented more evidence detailing Nieber's role in the crimes than what had been before the court at the time of the preliminary hearing, including witness testimony, bank surveillance photos, and a timeline established by the use of ATM machines. These additional facts were appropriately considered at the section 1172.6 hearing and led the court, in its capacity as a factfinder assessing Nieber's role in the crime, to make the type of finding a jury would make. Thus, the court did not err by holding a hearing under subdivision (d)(3).

## C. Collateral Estoppel

Nieber next contends the magistrate's dismissal of the special-circumstance allegation operates as collateral estoppel to bar the prosecution from claiming he was a major participant in the underlying crime who acted with a reckless indifference to human life.

Collateral estoppel prohibits relitigation of issues argued and decided on their merits in prior proceedings. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341-343.) The doctrine traditionally applies when four requirements are met: " 'First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' " (*People v. Gonzalez* (2021) 65 Cal.App.5th 420, 433.)

Nieber argues these requirements are met because the court's finding at the preliminary hearing was final and on the merits. However, " 'the doctrines of res judicata or collateral estoppel are inapplicable to orders dismissing criminal proceedings following preliminary hearings.' " (*Wallace, supra*, 33 Cal.4th at p. 749; *Uhlemann, supra*, 9 Cal.3d at pp. 667-668.) As we previously explained, the magistrate's findings following a preliminary hearing are not final. "When a magistrate declines to hold a defendant to answer on the ground that the evidence at the preliminary hearing did not establish probable cause to believe the defendant committed the charged offense, the ruling does not bar future prosecution. [Citation.]" (*Wallace*, at p. 749.) "The prosecution may file another complaint charging the same

20

offense or may file an information charging the same offense in the trial court." (*Ibid.*) Further, determination at the preliminary hearing does not implicate principles of double jeopardy and does not constitute law of the case. (*People v. Jurado* (2006) 38 Cal.4th 72, 94 (*Jurado*).)

Nieber contends the holdings in *Wallace* and *Jurado* are inapplicable because, in those cases, the prosecution acted after the preliminary hearing decision to refile allegations following a section 996 hearing (*Wallace, supra,* 33 Cal.4th at pp. 742-744) or to file a writ of mandate (*Jurado, supra,* 38 Cal.4th at p. 94). But the actions subsequently taken by the prosecution do not change the quality of the preliminary hearing decision. For the same reasons we conclude the preliminary hearing finding does not automatically qualify Nieber for relief under section 1172.6, subdivision (d)(2), we conclude the finding does not implicate the doctrine of collateral estoppel.

D. Sufficiency of Evidence

Finally, Nieber contends there is not sufficient evidence to support the court's determination that the People proved he was a major participant in the underlying crime, and he acted with a reckless indifference to human life.

We review the trial court's determination at the section 1172.6 evidentiary hearing for substantial evidence. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 747; accord, *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.) Under this standard, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation]. We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

21

doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

Considering the totality of the circumstances in the light most favorable to the trial court's ruling, we conclude substantial evidence supports its finding that Nieber could be convicted of murder under the new felony-murder standard because he was a major participant in the underlying felony and acted with a reckless indifference to human life.

### 1. Major Participant

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major." ' " (*Clark, supra*, 63 Cal.4th at p. 611.) To assist in answering this question, the California Supreme Court in *Banks* articulated the following considerations: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?"

22

(*Banks*, *supra*, 61 Cal.4th at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid*.)

Substantial evidence supports several of these factors. Records for B.W.'s stolen credit cards showed someone tried to use them near the Tommy Drive residence around 2:00 p.m. and 2:27 p.m. Surveillance footage showed a man driving B.W.'s vehicle, and two different detectives identified Nieber as the driver. The court considered the timeline established by this evidence and concluded Nieber had returned from using the credit and ATM cards when someone put a gun to the back of B.W.'s head and said, "What's the password? You gave me the wrong one." Thus, at a minimum, Nieber was present when violence was used against B.W., and he may have been the source of the violence. The timeline and testimony showing that Johnson left before B.A. arrived at the Tommy Drive residence also placed Nieber at the scene of B.A.'s murder.

Evidence also supports the conclusion that Nieber was aware of the dangers posed by the crime and of the weapons used. He was at the Tommy Drive residence over the course of several hours; witnesses testified they heard the intruders rummaging and ransacking, and Nieber's DNA was found on the methamphetamine pipe and the mouth of a beer bottle. Further, Nieber was present when the intruders entered the home forcefully, one holding a Baretta style automatic pistol to S.P.'s head. He was also present when B.W. arrived home and the intruders put a silver handgun in his face.

Nieber's presence at, and participation in, the underlying felony supports the trial court's finding that he was a major participant. (See *Banks*, *supra*, 61 Cal.4th at p. 805 [finding, by contrast, that the defendant

was not a major participant in a robbery felony murder because he was absent from the scene during the robbery and the murder].)

Moreover, Nieber's conduct "after the lethal force was used" (*Banks*, *supra*, 61 Cal.4th at p. 803) also supports the finding he was a major participant. Not only did he not render aid to the murder victim, but he also left behind S.P. and B.W., still bound with their faces covered. (See *id.* at p. 807 [noting the defendant "did not see the shooting happen . . . and could not do anything to . . . render assistance"].)

Because substantial evidence supports these *Banks* considerations, it is of no moment whether the remaining considerations are neutral or favor Nieber. (See *Banks*, *supra*, 61 Cal.4th at p. 803 [no single consideration necessary; no one consideration necessarily sufficient; all may be weighed].)

### 2. Reckless Indifference to Human Life

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*), brackets in original.)

24

In *Clark, supra*, 63 Cal.4th 522, the California Supreme Court articulated the following considerations for determining whether a defendant acted with reckless indifference to human life: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark*, at pp. 618-623].)

The reckless indifference considerations " 'significantly overlap' " with the major participant considerations, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark, supra*, 63 Cal.4th at p. 615.) As with the major participant considerations, " '[n]o one of [the reckless indifference] considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id.* at p. 618.) "We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life." (*Scoggins, supra*, 9 Cal.5th at p. 677.)

Considering the totality of the circumstances, we conclude substantial evidence supports the *Clark* considerations.

The United States Supreme Court has "stressed the importance of presence to culpability." (*Clark, supra*, 63 Cal.4th at p. 619, citing *Tison v. Arizona* (1987) 481 U.S. 137, 158.) Where "the murder is a culmination or a foreseeable result of several intermediate steps . . . , 'the defendant's presence

25

allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state . . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Clark*, at p. 619.)

As noted *ante*, Nieber was present for and participated in the robbery. Additionally, the record supports a reasonable inference that he did not intervene to prevent the murder. Nieber neither rendered aid at the scene to the murder victim, whom intruders left lying face down in a pool of blood, nor the robbery victims, who were left in vulnerable positions, on the floor face down, with cloth over their faces and their hands bound behind their backs. (See *Clark*, *supra*, 63 Cal.App.4th at p. 619 [noting the United States Supreme Court and "[o]ther appellate courts have considered relevant a defendant's failure to provide aid while present at the scene"]; *Scoggins*, *supra*, 9 Cal.5th at p. 672 [finding no reckless indifference where, "[a]fter the shooting, [the defendant] walked over to [the victim] and checked if he was still breathing," and then remained at the scene and was "cooperative" with law enforcement].) These considerations strongly support a finding Nieber acted with reckless indifference to human life.

The duration of the felony also weighs against Nieber. After he entered the Tommy Drive residence and S.P. was subdued, the intruders ransacked the home. The evidence supports a conclusion that Nieber took the time to drink beer and smoke methamphetamines. This was a prolonged robbery, during which the intruders waited for B.A. to arrive.

There is no evidence that Nieber had knowledge of factors bearing on his cohorts' likelihood of killing, but he was aware they brought a weapon,

26

which they were using.  He was at least present when the weapon was used to injure B.W.  And he did not take any steps to diffuse the situation or minimize the risks of violence.

In sum, "nonkiller felony murderers fall on a continuum, a spectrum of culpability." (*Banks*, *supra*, 61 Cal.4th at p. 811.)  We are satisfied that substantial evidence supports the trial court's finding that Nieber was a major participant in the underlying felony who acted with reckless indifference for human life.  Accordingly, the court did not err in denying his petition for resentencing under section 1172.6.

DISPOSITION

The order denying Nieber's petition for resentencing under section 1172.6 is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


DO, J.

27